IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRUCE E. VAWSER, | ) | 4:06CV3217 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| TINA UPDEGROVE, and SCOTT WILSON, | ) | **AND ORDER** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on Defendants Tina Updegrove ("Updegrove") and Scott Wilson's ("Wilson") Motion to for Summary Judgment. (Filing No. 78.) As set forth below, the Motion is granted.

### I.   BACKGROUND

Plaintiff filed his Complaint in this matter on September 4, 2006. (Filing No. 1.) Defendants filed a Motion to Dismiss, which the court denied on September 28, 2007. (Filing No. 34.) The court denied the Motion to Dismiss without prejudice to reassertion and permitted Plaintiff an opportunity to file an amended complaint. (*Id.*) For his Amended Complaint, the court instructed Plaintiff to "set forth the factual basis" for certain state law claims against Updegrove and Wilson. (*Id.* at CM/ECF p. 8.) Plaintiff filed his Amended Complaint on November 13, 2007. (Filing No. 39.) Updegrove and Wilson filed their second Motion to Dismiss and Brief in Support on December 17, 2007. (Filing Nos. 44 and 45.)  However, the court denied the Motion

on April 29, 2008, because Plaintiff had "nudged" his claims across the line from conceivable to plausible. (Filing No. 51 at CM/ECF pp. 6-7.)[1]

Pursuant to the Progression Order, Defendants filed their Motion for Summary Judgment on February 11, 2009. (Filing No. 78.) Along with their Motion, Defendants filed an Index of Evidence and Brief in Support. (Filing Nos. 79 and 80.) Despite having more than two months in which to do so, Plaintiff did not file an opposition or any other response to Defendants' Motion. (*See* Docket Sheet.)

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." *Id.*

Defendants have submitted a statement of material facts in accordance with the court's Local Rules. However, Plaintiff has not submitted any "concise response" to those facts. Further, Defendants submitted evidence which was properly authenticated. Plaintiff has not. This matter is deemed fully submitted and the

---

[1] This Memorandum and Order only addresses the claims against the remaining Defendants, Wilson and Updegrove. The court dismissed the claims against Defendant Tressa Alioth with prejudice on April 29, 2008 because she was entitled to absolute prosecutorial immunity. (Filing No. 51.) Thus, use of the term "Defendants" in this Memorandum and Order refers only to Wilson and Updegrove.

material facts set forth by Defendants in their Brief are "deemed admitted" and are adopted below.

## II. RELEVANT UNDISPUTED MATERIAL FACTS

1. Plaintiff is a resident of Omaha, Douglas County, Nebraska.

2. Updegrove is a resident of Red Oak, Iowa.

3. Wilson is a resident of Indianola, Iowa.

4. The allegations asserted in Plaintiff's Amended Complaint took place in Omaha, Douglas County, Nebraska.

5. In 2004, Plaintiff resided at 2008 North 25th Street, with his brother Edward Vawser.

6. On July 18, 2003, Plaintiff pled guilty to a charge of animal cruelty in the County Court of Douglas County, Nebraska, Case Number CR 03 0015700.

7. The 2003 conviction pertained to an underfed dog having an internal cyst near the stomach area.

8. Updegrove was an animal control officer/investigator for the Nebraska Humane Society in 2004.

9. Wilson was also an animal control officer/ investigator for the Nebraska Humane Society in 2004.

10. In 2004, the City of Omaha contracted with the Nebraska Humane Society to enforce Omaha's animal control laws.

11. On March 24, 2004, Updegrove was on patrol in the area of 2000 N. 25th street in Omaha, Nebraska when she observed a heavy chain wrapped several times around the neck of Plaintiff's pit bull named "Rampage."

12. Updegrove observed that Plaintiff was having Rampage jump up after a lure suspended from a tree in the yard.

13. Wrapping a heavy chain around a dog's neck and having it jump is a practice often used by dog fighters to strengthen the dog's neck and to condition the dog for fighting.

14. Plaintiff admits he wrapped a heavy chain around Rampage's neck to build up the dog's upper body muscles.

15. Updegrove cited Plaintiff for animal cruelty with regard to the March 24, 2004 incident.

16. On July 7, 2004, Plaintiff pled guilty to a charge of animal cruelty (physical abuse), with regard to the March 24, 2004, incident in the County Court of Douglas County, Nebraska.

17. Sometime in the summer of 2004, Wilson investigated a dog fighting incident and questioned Plaintiff.

18. On August 9, 2004, two of Plaintiff's dogs, Rampage and Cocoa, got into a fight.

19. In the August 9, 2004, incident, Rampage incurred a laceration to its ear and was taken to the veterinarian.

20. Prior the summer/fall 2004, Plaintiff began efforts to sell eight American Pit Bull Terrier puppies in his possession.

21. Plaintiff had cropped the ears of some of the puppies.

22. Plaintiff acknowledges that cropping a dog's ears is usually done for fighting purposes, so the dog's ears don't get ripped during fights.

23. On at least two occasions prior to October 10, 2004, Kendall Tealer ("Tealer") came to Plaintiff's residence.

24. On or about October 10, 2004, Plaintiff began an approximately 60 day jail sentence at the York County, Nebraska jail.

25. On October 15, 2004, Kimberly Hansen, Plaintiff's girlfriend at the time, filed a complaint with the Omaha Police Department regarding robbery of seven puppies from Plaintiff's home located at 2008 N. 25th Street in Omaha, Nebraska.

26. On October 22, 2004, Officer Catherine Martinec ("Martinec") of the Omaha Police Department took Tealer into custody with regard to the possible theft of seven pit bull puppies from 2008 N. 25th Street.

27. Tealer, under questioning by Martinec, indicated he had a claim of ownership of the puppies and had removed the puppies out of concern for their welfare.

28.  During the police interrogation, Tealer indicated he and an individual named Jose Butler went to Plaintiff's address on October 8, 2004, to breed Mr. Butler's pit bull with Plaintiff's pit bull.

29.  Tealer told Martinec that Plaintiff's pit bull had numerous bite wounds on its body and that it proceeded to attack Mr. Butler's pit bull.

30.  Tealer also told Martinec that he had personal knowledge that Plaintiff fought his pit bulls at Plaintiff's residence located at 2008 N. 25th Street.

31.  Tealer told Martinec that the puppies were a result of breeding Plaintiff's pit bull with his own pit bull.

32.  Tealer removed the puppies from Plaintiff's residence because he was concerned the puppies would be used for dog fighting in the future.

33.  Martinec, finding Tealer to be credible because he made several statements against his penal interest, contacted Wilson to further investigate the matter.

34.  On October 22, 2005, Wilson, Martinec and Tealer went to Tealer's residence at 4927 Evan Street in Omaha, Nebraska to look at the pit bull puppies.

35.  At that time, Wilson and Martinec were shown five pit bull puppies.

36.  Of those puppies, Wilson observed four of the puppies had their ears cropped.  Based upon Wilson's experience, Wilson was able to tell the cropping was done in a non-professional manner and obviously not by a veterinarian.

37.     Based upon Wilson's experience, he is aware cropping of the ears is done primarily for dog fighting purposes.

38.     Upon questioning from Wilson, Tealer admitted that he had been on Plaintiff's property, located at 2008 N. 25th St., on two occasions, September 27, 2004 and October 1, 2004, and had witnessed staged dog fights in which Plaintiff participated.

39.     Tealer indicated that Plaintiff's dog Cocoa had recent fight-related injuries to its face and the dog Rampage also had some injuries.

40.     Tealer indicated that Plaintiff had obtained the dog Rampage from a person called Carl.

41.     Wilson had knowledge that Carl Tiller had been previously involved in dog fighting activities.

42.     Upon questioning from Wilson, Tealer stated that he believed that Plaintiff had purchased the dog Rampage from Mr. Tiller.

43.     Plaintiff testified that he purchased Rampage from Anthony Dixson, Cocoa from Carl Thomas, and that he found Foxey on the street.

44.     Plaintiff acknowledges that he has seen "a couple, just a handful" of unorganized dog fights on the streets.

45.     Wilson was aware of Plaintiff's previous animal cruelty charges when he applied for an issuance of a search warrant.

46. On October 25, 2004, Wilson filed an Affidavit and Application for Issuance of a search warrant for the property located at 2008 North 25th Street in Omaha, Nebraska with the County Court of Douglas County, Nebraska.

47. On October 25, 2004, a Douglas County Court Judge approved the search of Plaintiff's residence.

48. Plaintiff believes Wilson and Updegrove did not act in good faith when they applied for the search warrant.

49. Plaintiff alleges generally that Wilson and Updegrove relied unreasonably on the allegedly false statements of Tealer in regards to obtaining the Search Warrant and executing the search warrant of his house.

50. Updegrove did not apply nor assist in applying for a search warrant of Plaintiff's residence, but participated in the execution of the search warrant only.

51. Wilson, Updegrove and Omaha Police Officers Scherer, Martinez and McGhee conducted a search of Plaintiff's residence on October 25, 2004.

52. Kimberly Hansen, Christener Lamb and Edward Vawser were inside the residence at the time of the search. Ms. Hansen indicated that the three pit bulls on the premises were owned by Plaintiff.

53. A search of the property found three pit bulls, Rampage, male described as a red merle, Cocoa, a female described as a brindle, and Foxey, a female described as brown.

54. Cocoa exhibited numerous bite wounds to the face, head and neck and appeared to have an infection on the left side of the neck.

55. Foxey was severely underweight with ribs, hips and lumbar vertebrae easily visible and a severe abdominal tuck.

56. Rampage had a couple of old wounds on his face and a scabbed wound over the left eye.

57. A search of the house revealed numerous areas of suspected bloodstains in the basement of the residence.

58. The pattern of the bloodstains, a spatter and smear pattern that Wilson and Updegrove observed is indicative of a dog being slammed against a wall, along with the height of the bloodstains, between 24 and 36 inches above the floor, are typical patterns found in dog fighting venues.

59. Wilson and Updegrove found two wooden sticks and one plastic stick which both appeared to be "breaking sticks," utilized to separate pit bulls in the course of a fight and typically found in dog fighting venues.

60. Wilson and Updegrove found a wooden door laying in the basement with what appeared to be bloodstains on it. These apparent bloodstains were also in a spatter and smear pattern and it appears that the door may have been used as a wall for a makeshift fighting pit.

61. Also found in the basement was a rolled up area of carpet with what appeared to be bloodstains. Carpeting or canvas will often be used on the floor of a fighting pit to provide additional traction for the dogs that are fighting.

62. Plaintiff and Kimberly Hansen were the only individuals who possessed a key to the residence located at 2008 North 25th Street in October 2004.

63. Edward Vawser, Plaintiff's brother who lived with Plaintiff, typically entered the residence through an unlocked window.

64. Plaintiff later signed over Foxey and Cocoa to the Humane Society relinquishing control of the two dogs.

65. Plaintiff later signed over Rampage to Melinda Morris relinquishing any control over the dog.

66. Tealer was killed on November 28, 2005 in Omaha, Nebraska.

(Filing Nos. 79 at CM/ECF pp. 1-8 and 80.)

### III.  ANALYSIS

#### A.  Standard of Review

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See also* Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate the allegations with "'sufficient probative evidence [that] would

permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.    Defendants' Motion**

1.    Defendants as State Actors

Liberally construed, Plaintiff invokes federal question jurisdiction, alleging that Defendants violated his "constitutional and statutory" rights when obtaining, and then executing, the search warrant. (Filing No. 39 at CM/ECF p. 4.) To obtain relief for violations under 42 U.S.C. § 1983, a plaintiff must show (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that a person acting under color of state law caused the deprivation. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993). "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

The actions of a private party may be "fairly attributable" to the state in certain circumstances when the private party acts in concert with state actors. *Id.* at 838 n. 6. Although a private person who is a willful participant in joint action with a state actor may act under color of state law, there must at least be a shared purpose to deprive the plaintiff of a constitutional right, namely, "a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Mershon v.*

-11-

*Beasley*, 994 F.2d 449, 451-52 (8th Cir. 1993), cert. denied, 510 U.S. 1111 (1994). Accord *Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir. 1997). Moreover, "[w]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Daskalea v. Washington Humane Soc'y*, 577 F. Supp. 2d 90, 98 (D.D.C. 2008) (quotations omitted) (holding that animal control officers were entitled to qualified immunity and affirming previous decision that animal control officers were state actors because they "perform[] a traditional, governmental function").

Here, Defendants performed traditional, governmental functions. In particular, as animal control officers, Defendants were "authorized . . . to issue written notices, impound animals, investigate violations, issue citations, to obtain search warrants, and orders of impoundment and seize and control evidence." Omaha Mun. Code, § 6-4 (2003). As Plaintiff's Amended Complaint shows, Defendants engaged in all of these activities with regard to Plaintiff.[2] Wilson obtained the search warrant to search Plaintiff's residence and Defendants partnered with the Omaha Police Department in obtaining and executing the search warrant at Plaintiff's residence. Defendants issued citations and seized evidence in conjunction with their search. Certainly, Defendants were willful participants in joint actions with state actors in this matter and functioned as instrumentalities of the state in carrying out their duties as animal control officers. Thus, as in *Daskalea*, as individually named employees of the humane society, Defendants were "endowed" with, and carried out, certain governmental powers and functions. As such, Defendants were state actors and are therefore entitled to claim qualified immunity from Plaintiff's § 1983 claim, provided that they can establish that qualified immunity applies.[3]

---

[2]Plaintiff has never argued that Defendants were not state actors.

[3]By this Memorandum and Order, the court does not find that Nebraska Humane Society investigators/employees are *always* state actors. Rather, under the

### 2. Legal Standards for Qualified Immunity

Qualified immunity is a question of law to be determined by the court and should ordinarily be decided long before trial *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "Public officials, of course, are entitled to qualified immunity from liability for damages under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Domina v. Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In short, "qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information [that the defendant] possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (citations and quotations omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations and quotations omitted). Moreover, qualified immunity is "the usual rule" and state actors will enjoy qualified immunity in all but "exceptional cases." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996).

The court focuses on two questions to determine whether a state official is entitled to qualified immunity: "(1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand that their conduct was unlawful . . . ." *Henderson v. Munn,* 439 F.3d 497, 501 (8th Cir. 2006) (citations and quotations omitted). Thus, the "initial inquiry is whether the facts as alleged show that the officers' conduct violated a constitutional right. . . . If the facts do not

---

circumstances of this case, and in light of the specific activities in which Defendants engaged and Plaintiff's allegations, the court finds that Defendants were state actors.

show a violation, [a court] need not proceed further with the qualified immunity analysis." *Brockinton v. City of Sherwood*, 503 F.3d 667, 672 (8th Cir. 2007).

### 3.     Deprivation of a Constitutional Right

Liberally construed, Plaintiff alleges that Defendants violated his Fourth Amendment rights because they relied on the false statements of Tealer in obtaining, and thereafter executing, the search warrant. (Filing No. 39.) "In the context of obtaining a warrant, a police officer will lose his qualified immunity only if 'the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Brockinton*, 503 F.3d at 674 (quoting *George v. City of St. Louis*, 26 F.3d 55, 57 (8th Cir. 1994)). In addition, where a plaintiff alleges that an officer should have investigated further, a plaintiff must allege that the "failure to investigate was intentional or reckless, thereby shocking the conscience." *Id.* at 672. Negligence in the investigation, or being "ultimately incorrect in his conclusion," does not defeat an officer's qualified immunity. *Id.*

Here, as in *Brockinton*, Plaintiff has not alleged or proven sufficient facts showing that Defendants' "belief in the existence of probable cause in the warrant application was unreasonable." *Id.* at 674. Importantly, Wilson applied and attested to probable cause for the search warrant based on Tealer's statements that Plaintiff was engaging in dog fighting activities *and* Wilson's own investigation. In conducting his investigation, Wilson discovered Plaintiff's two previous convictions for animal cruelty and the fact that at least one of those convictions related to known dog fighting activities. In addition, prior to obtaining the search warrant, Wilson visited Tealer's residence and personally examined the pit bull puppies, noting that their ears had been cropped in a non-professional manner, a practice normally only done for dog fighting purposes. The combination of all these findings, in conjunction with Tealer's statements, led Wilson to prepare and obtain the search warrant. Thus, although Plaintiff was ultimately not convicted of charges stemming from the

resulting search, at the time the warrant was issued, Defendants reasonably believed that probable cause existed to support the warrant. In light of these findings, Plaintiff has not established that Defendants violated a constitutional right and there is no need to proceed further. Defendants are entitled to qualified immunity and the federal claims against them are dismissed.

### C. Plaintiff's State-Law Claims

Because the court has now dismissed all of Plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3). Consequently, Plaintiff's Amended Complaint is dismissed in its entirety, but the court will dismiss the state-law claims without prejudice.

IT IS THEREFORE ORDERED that:

1. Defendants' Motion for Summary Judgment (filing no. 78) is granted and Plaintiff's federal claims against Wilson and Updegrove are dismissed with prejudice.

2. Plaintiff's state law claims are dismissed without prejudice.

3. A separate judgment will be entered in accordance with this Memorandum and Order.

May 14, 2009.                             BY THE COURT:

                                          s/ Joseph F. Bataillon
                                          Chief United States District Judge